UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2003 DEC -2 P 12:09

| | |
|---|---|
| CCI, INC. | C.A. NO. 3:00 CV 1860 (SRU) |
| VS. | |
| R.H. BOYD PUBLISHING CORPORATION | NOVEMBER 26, 2003 |

### PLAINTIFF CCI, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT R.H. BOYD PUBLISHING COMPANY'S MOTION TO QUASH NOTICE OF DEPOSITION AND FOR PROTECTIVE ORDER

Plaintiff CCI, Inc. hereby files this memorandum of law in opposition to defendant R. H. Boyd Corporation's Motion to Quash Notice of Deposition and Motion for Protective Order.

Plaintiff has noticed the deposition of Dr. T.B. Boyd, the President and Chief Executive Officer of the defendant.[1] Defendant R.H. Boyd Publishing Corporation is a for profit entity whose stock is wholly owned by a not for profit entity called R. H. Boyd Company, d/b/a National Baptist Publishing Board that was formerly known as the National Baptist Publishing Board [National Baptist]. Dr. T. B. Boyd heads a nine member Board that directs the operation of the not-for-profit R.H. Boyd Company, a company founded by this president's great-grandfather in 1900. Dr. Boyd is the president and CEO of the for-profit R. H. Boyd Corporation that is headed by the same

---

[1] Defendant makes the claim (Def. Mem. at 3) that plaintiff is required to serve Dr. Boyd with a subpoena because he is a non-party and a notice of deposition directed to defendant R.H. Boyd Publishing Corporation is not enough to compel his attendance as the president of the corporation. Defendant also claims that the notice is insufficient to require Dr. Boyd to produce his tax personal tax returns. While plaintiff agrees that a subpoena duces tecum may be required to compel production of Dr. Boyd's personal tax returns, defendant is incorrect to state that the notice is insufficient to compel Dr. Boyd to appear under Rule 30. Nevertheless, based on conversations with defendant's counsel, plaintiff understands that a subpoena will not be necessary to compel Dr. Boyd's attendance and that he will produce documents in accordance with this court's order on the present motion.

1

nine member Board. (See deposition of Dr. T. B. Boyd at pp. 7-12, copy attached) This new arrangement of a not-for-profit entity controlled by Dr. Boyd owning a for-profit entity also controlled by Dr. Boyd doing the same business from the same location did not exist prior to the year 2000.

Plaintiff CCI, Inc. was employed by National Baptist in 1996 to support the accounting and order processing software known as WDS II.[2] In anticipation of Y2K, National Baptist chose to replace the WDS II software plaintiff was supporting with another accounting and order processing software sold by plaintiff known as MXP. During the process of implementing the conversion of data from WDS II to the MXP software, in December of 1999, plaintiff was informed that National Baptist had decided to change its fiscal year from November 1 through October 31 to a calendar year. This change from a fiscal to a calendar year required major changes in the set-up of the books of the corporation in the computerized system. A new year had to be created that spanned the months of November and December of 1999. As a result, CCI, Inc. was required to convert data for National Baptist's fiscal year November 1, 1998 to October 31, 1999 from WDS II to MXP. National Baptist also had a new fiscal year limited to the months of November and December of 1999. The new calendar year for National Baptist commenced on January 1, 2000, but at the same time National Baptist changed its name to R.H. Boyd Publishing Corporation, a for profit corporation that was wholly owned by R.H. Boyd Company/ d/b/a National Baptist Publishing Board. The name change was announced at about the same time as the change in the fiscal year. Although Dr. Boyd testified that this name change had been approved in 1996, for some reason neither the

---

[2] Unless otherwise indicated, the statements of fact are based on the Affidavit of Edward E. DeMuzzio, president of CCI, Inc. filed along with this opposition memo.

name change nor the change from a fiscal to a calendar year was communicated to CCI until one year after the sales agreement with National Baptist was executed and only after CCI had nearly completed its punch list of items that required adjustment in the forms and procedures. The changes requested by National Baptist caused CCI, Inc. to spend much additional time on the project.

According to the sales agreement, National Baptist was required to support the conversion project by comparing the converted forms and data to assure accuracy. National Baptist reviewed the order processing functions and communicated requests for changes to forms that CCI had created. National Baptist had not closed the books on the WDS II system at the time the conversion process started on October 1, 1999. National Baptist had rejected CCI's recommendation that it await the end of the fiscal year before changing over to the MXP software. On more than one occasion following the initial conversion of data, National Baptist requested additional "dumps" of the data that would be found in the general ledger. The general ledger component supports financial records, including the income statement, the balance sheet and the profit and loss statement. CCI requested verification of the general ledger by Memo to Reverend Grant from Edward DeMuzzio on January 31, 2000.

Reverend Walter Grant held the position of Director of Finance in March of 2000. He had been intimately involved in the negotiation of the agreement to purchase MXP.[3] When the MIS person, Virginia Gunn left the company just prior to the start of the conversion process, in August of 1999, Reverend Grant was responsible for implementing the conversion and in charge of Sharonda Dowell, an employee who

---

[3] National Baptist declined to continue with a Y2K compliant version of WDS II, an option that was provided by CCI in 1998.

worked with the general ledger. For reasons that are not clear, Reverend Grant never communicated with CCI., Inc. regarding changes to the general ledger. He testified that he was too busy with getting orders out to bother with the general ledger and kept the records by hand. (See Excerpt from the Deposition of Reverend Grant where he acknowledges he did not attend training, at pp. 79-82, delegated the conversion to Sharonda Dowell, at pp17-18 & 83, 86-88, and was too busy to check the general ledger because he was getting orders out, pp. 90-92). Sharonda Dowell testified she was told not to communicate with CCI regarding issues with the MXP system. (See pp. 21-22 of Deposition of Sharonda Dowell). CCI, Inc. would have had no way to verify the accuracy of the accounts in the general ledger and it was a simple task for Reverend Grant, or someone under his control, to compare the amount in each numbered account in order to verify the accuracy of the conversion. During this litigation, National Baptist, now R.H. Boyd, has taken the position that the failure of the general ledger to balance represents a defect in the software, yet this claim was never brought to the attention of CCI., Inc. R.H. Boyd claims that the failure of the conversion required it to spend enormous sums of money on temporary labor to recreate the books of the company.[4] While there is evidence that R.H. Boyd converted at least some of the data from MXP, this aspect of the case has not been closely examined. What is known, however, is that once CCI learned in this litigation that the general ledger was an issue, it took CCI approximately 90 minutes to locate an error in the conversion process that made the general ledger, a collection of reports that contained millions of bits of data that was

---

[4] R.H. Boyd used the MXP software to process 84,000 orders between October of 1999 and September of 2000 when the new accounting software, MAS 90, was installed by a different vendor.

4

otherwise converted without incident, $35.72 out of balance.[5] Why would Reverend Grant fail or refuse to take the time to verify the accuracy of the general ledger in March of 2000, yet continue to promise CCI it would be paid for the balance of the contract in April of 2000 and repeatedly thereafter through August of 2000?

Defendant was obligated to support the conversion process by training its employees in the operation of the MXP software. Plaintiff's president, Edward Demuzzio spent over 300 hours training employees of the defendant in the operation of the MXP software. Reverend Grant never attended any training sessions. The vast majority of the "defects" identified by defendant and proved by documents produced in this case, reveal basic misunderstanding of the operator in the use of the software.[6] On the other hand, plaintiff is advised that no such problems were encountered in the operation of the MAS 90 software that replaced the MXP sold by the plaintiffs. In support of R.H. Boyd's claim for damages in excess of $600,000 and in defense of its failure to pay plaintiff CCI for the work performed, despite repeated assurances following the last "dump" of the general ledger, defendant advances the argument that it would be highly unlikely that defendant would switch software providers so deep into the program after having spent all the time and effort with MXP, unless the software was highly defective. Why would Boyd incur all the expense of temporary labor to reconstruct its books, if Boyd was not desperate in the face of the defective software that could not be made to work properly?

---

[5] CCI surmises that a power surge caused a duplicate entry in the conversion process that was easily found and remedied.

[6] For example, one of the prime examples of software defect provided by defendant showing a difference in balance on a report printed minutes apart reveals that the operator did not insert the same number of 9s in a field that controls the calculation of such balances.

CCI supports MXP software for many corporate clients, some larger than Boyd. MXP software operates successfully for CCI Inc.'s other clients and has never been claimed to be defective. Additionally, CCI has been involved with conversions of data in the past similar to the conversion situation in Boyd. No prior corporate client has ever experienced the problems that Boyd claims to have experienced. While there are undoubtedly adjustments to be made to the software program to fit the needs of the client, just as MXP was designed for, no other corporate client ignored the obligation to compare the data converted to the general ledger in MXP to the data in the general ledger as recorded by the prior software accounting system. Why didn't Reverend Grant advise CCI that he had a problem with the general ledger?

Defendant R.H. Boyd claims, as damages in this case, penalties it was required to pay the Internal Revenue Service for late filing of tax returns. CCI., Inc. and the "defective" MXP software are to blame for the late filing. CCI., Inc. has discovered, in records produced in discovery, that there were many checks totaling $566,785 that were made payable to Dr. Boyd through the first nine months in 2000. In two cases, checks totaling $25,000 each were reclassified in the general ledger to a manufacturing expense. In two years, 1999 & 2000, checks in the amount of $200,000 were written to "Boyd Publishing" and no entry was made for the general ledger in 2000. Dr. Boyd received $574,179 as a "vendor" in 1999. Of the $566,785 in checks that were written to him as "miscellaneous" expenses or for "housing," less than $4,000 is recorded in the General Ledger Trial Balance for period 12, indicating that the money had disappeared or was reclassified. More than $56,000 was paid to Dr. Boyd by checks that did not appear in the AP Check Register. Plaintiff has not yet had the opportunity to obtain an explanation

6

for this reclassification, but this information does provide the appearance of impropriety and plaintiff seeks discovery of Dr. T. B. Boyd's tax returns in order to compare and verify that he has reported all the income he allegedly received from National Baptist/R.H. Boyd. If Dr. Boyd has not reported his income accurately, then the answer to the questions posed by R.H. Boyd regarding its motive in changing fiscal year, name, corporate form and vendor would all be answered, as would be plaintiff's question about Reverend Grant's failure to reconcile the converted general ledger: Dr. Boyd used the alleged failure of the MXP program to cover-up a scheme to evade taxation of income.

Plaintiff has no quarrel with the standards for discovery set forth in support of defendant's position in this matter. Plaintiff asserts that the information related in the Affidavit of Edward E. Demuzzio, and in this opposition memorandum satisfies the requirements listed by Magistrate Judge Fitzsimmons in *Gattegno v. Pricewaterhousecoopers,* 205 F.R.D. 70 (d. Conn. 2001). Dr. Boyd's personal tax returns are clearly relevant if they show, in combination with entries in the check registers, the checks he wrote to himself and in the trial balance and general ledger, that his income was not consistent with the amounts that were paid to him by the defendant. There is a compelling need for this information because the plaintiff has no other avenue but to request the information from Dr. Boyd. Admittedly, there may be other explanations for the unusual movement of vast sums of money, but at this stage in the litigation plaintiff is entitled to discover information that may lead to the discovery of additional evidence to support its theory that defendant used Y2K, a change in software, a change in corporate status, a change in name and a change in fiscal to calendar year to cover-up a scheme to defraud the IRS.

Wherefore, for all the foregoing reasons, plaintiff respectfully requests that the court deny the defendant's Motion to Quash Notice of Deposition and Motion for Protective Order and order Dr. Boyd to provide authorization to obtain his tax returns for 1999 and 2000.

Dated at New London, Connecticut on this 26th day of November, 2003.

PLAINTIFF
CCI, INC.

By: _____
Jacques J. Parenteau, Federal Bar No.:09771
Madsen, Prestley & Parenteau, LLC
111 Huntington Street, P.O. Box 1631
New London, CT  06320
Telephone:  (860)442-2466
Facsimile:  (860)447-9206
E-Mail:  jparenteau@mppjustice.com
Its Attorneys

## CERTIFICATION

I hereby certify that a copy of the foregoing Opposition Memorandum was mailed and faxed to the following counsel and pro se parties of record on this 26th day of November, 2003:

Mark E. Block, Esq.
O'Brien, Shafner, Stuart, Kelly & Morris, P.C.
P.O. Box 310
Norwich, CT  06360

_____
Jacques J. Parenteau

8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2003 DEC -2 P 12: 09

| | | |
|---|---|---|
| CCI, INC. | : | C.A. NO. 3:00 CV 1860 (SRU) |
| | : | |
| VS. | : | |
| | : | |
| R.H. BOYD PUBLISHING | : | |
| CORPORATION | : | NOVEMBER 26, 2003 |

### AFFIDAVIT OF EDWARD E. DEMUZZIO

The undersigned, being duly sworn, did depose and say:

1. I am the president of CCI, Inc. and have personal knowledge of the matters set forth herein.

2. Plaintiff CCI, Inc. was employed by National Baptist in 1996 to support the accounting and order processing software known as WDS II.

3. In anticipation of Y2K, National Baptist chose to replace the WDS II software plaintiff was supporting with another accounting and order processing software sold by plaintiff known as MXP.

4. National Baptist declined to continue with a Y2K compliant version of WDS II, an option that was provided by CCI in 1998.

5. During the process of implementing the conversion of data from WDS II to the MXP software, in December of 1999, plaintiff was informed that National Baptist had decided to change its fiscal year from November 1 through October 31 to a calendar year.

6. This change from a fiscal to a calendar year required major changes in the set-up of the books of the corporation in the computerized system. A new year had to be created that spanned the months of November and December of 1999.

7. As a result, CCI, Inc. was required to convert data for National Baptist's fiscal year November 1, 1998 to October 31, 1999 from WDS II to MXP. National Baptist also had a new fiscal year limited to the months of November and December of 1999.

8. The new calendar year for National Baptist commenced on January 1, 2000, but at the same time National Baptist changed its name to R.H. Boyd Publishing Corporation, a for profit corporation that was wholly owned by R.H. Boyd Company/ d/b/a National Baptist Publishing Board.

9. The name change was announced at about the same time as the change in the fiscal year.

10. Although Dr. Boyd testified that this name change had been approved by the Board in 1996, neither the name change nor the change from a fiscal to a calendar year was communicated to CCI until one year after the sales agreement with National Baptist was executed and only after CCI had nearly completed its punch list of items that required adjustment in the forms and procedures.

11. The changes requested by National Baptist caused CCI, Inc. to spend much additional time on the project.

12. According to the sales agreement, National Baptist was required to support the conversion project by comparing the converted forms and data to assure accuracy.

13. Employees of National Baptist reviewed the order processing functions and communicated requests for changes to forms that CCI had created.

14. National Baptist had not made the month end and year end entries into the general ledger in order to close the books on the WDS II system at the time the conversion process started on October 1, 1999.

15. National Baptist had rejected CCI's recommendation that it await the end of the fiscal year before changing over to the MXP software.

16. On more than one occasion following the initial conversion of data, National Baptist requested additional "dumps" of the data that would be found in the general ledger.

17. The general ledger component supports financial records, including the income statement, the balance sheet and the profit and loss statement. CCI was asked to dump the general ledger data for the last time at the end of January 2000. See Memo from Ed DeMuzzio to Walter Grant dated January 31, 2000 referencing "New Companies" marked Exhibit 11.

18. Reverend Walter Grant held the position of Chief Financial Officer in March of 2000. He had been intimately involved in the negotiation of the agreement to purchase MXP.

19. When the MIS person, Virginia Gunn left the company just prior to the start of the conversion process, in August of 1999, Reverend Grant was responsible

for implementing the conversion and he supervised Sharonda Dowell, an employee who worked with the general ledger.

20. Reverend Grant never communicated with CCI., Inc. regarding changes to the general ledger.

21. CCI, Inc. would have had no way to verify the accuracy of the accounts in the general ledger and it was a simple task for Reverend Grant, or someone under his control, to compare the amount in each numbered account in order to verify the accuracy of the conversion.

22. R.H. Boyd used the MXP software to process 80,469 orders between October of 1999 and December of 2000, three months after the new accounting software, MAS 90, was installed by a different vendor.

23. During this litigation, National Baptist, now R.H. Boyd, has taken the position that the failure of the general ledger to balance represents a defect in the software, yet this claim was never brought to the attention of CCI., Inc.

24. Once CCI learned in this litigation that the general ledge was an issue, it took CCI approximately 90 minutes to locate an error in the conversion process that made the general ledger, a collection of reports that contained millions of bits of data that was otherwise converted without incident, $35.72 out of balance.

25. CCI surmises that a power surge caused a duplicate entry in the conversion process that was easily found and remedied.

26. Although Reverend Grant never took the time to verify the accuracy of the general ledger in March of 2000, he continued to promise CCI it would be

paid for the balance of the contract in a meeting with me in April of 2000 and repeatedly thereafter through August of 2000 when CCI., Inc. learned it would be replaced. See Memos to Walter Grant from Ed DeMuzzio dated May 1, 2000 (Exhibit 12), June 1, 2000 (Exhibit 14), August 6, 2000 (Exhibit 15) and August 15, 2000 (Exhibit 16).

27. According to the sales agreement for MXP, National Baptist was obligated to support the conversion process by training its employees in the operation of the MXP software.

28. I personally spent over 300 hours training employees of the defendant in the operation of the MXP software, even though the agreement only required 120 hours of training.

29. Reverend Grant never attended any training sessions.

30. The vast majority of the "defects" identified by defendant and allegedly supported by documents produced in this case, reveal basic misunderstanding of the operator in the use of the MXP software. For example, one of the prime examples of software defect provided by defendant showing a difference in balance on a report printed minutes apart reveals that the operator did not insert the same number of 9s (6 instead of 7) in a field that controls the calculation of such balances. See Exhibits 19 & 20 from Deposition dated 12-12-01.

31. CCI supports MXP software for many corporate clients, some larger than Boyd. MXP software operates successfully for CCI Inc.'s other clients and has never been claimed to be defective. Additionally, CCI has been involved

with conversions of data in the past similar to the conversion situation in Boyd. No prior corporate client has ever experienced the problems that Boyd claims to have experienced.

32. MXP was designed to make adjustments to the software program to fit the needs of the client. No other corporate client that employed CCI to perform a conversion to MXP ignored the obligation to compare the data converted to the general ledger in MXP with the data in the general ledger as recorded by the prior software accounting system.

33. Defendant R.H. Boyd claims, as damages in this case, penalties it was required to pay the Internal Revenue Service for late filing of tax returns. And the "defective" MXP software and CCI are to blame for the late filing.

34. According to a report prepared by CCI, Inc. for Reverend Grant listing 1099 payments, entitled "NBPB Vendor Amounts for 1999," Dr. T.B. Boyd received payments totaling $574,179.51. See two pages of the report attached as Exhibit A.

35. In reviewing the documents produced in discovery during the first nine months of the calendar year 2000, checks totaling $566,785 that were made payable to Dr. Boyd. See Excel Spread Sheet listing Checks submitted as Exhibit C.

36. According to hand written notations in a printed AP Check Register (sample pages are attached as Exhibit B) Dr. Boyd received checks totaling $501,655 that was posted to GL Code 6800-05-530 denominated as a "Miscellaneous" account in the General Ledger. However, the ending balance for that account,

according to the Trial Balance for period 12 was $3,126.25. The General Ledger Trial Balance for Period 12 for the year 2000 is submitted as Exhibit D.

37. According to hand written notations in a printed AP Check Register (sample attached as Exhibit B) Dr. Boyd received checks totaling $56,250 (see Exhibit C) that was posted to GL Code 6560-05-530 denominated as a "Housing Allowance" account in the General Ledger. However, the ending balance for that account, according to the Trial Balance for period 12 was $0.

38. According to the AP Check Register, over the course of nine days, Dr. Boyd received $72,000, in three system check #s 45760, 45784, 45797 made payable to Dr. T. B. Boyd in the amounts of $22,000, $25,000 and $25,000, indicated as posted in the "employee benefit" account GL 6120-05-510, yet the Trial Balance for Period 12 shows a negative balance of $271.78.

39. Documents produced in discovery include 8 manually created checks made payable to Dr. Boyd, signed by Dr. Boyd, totaling $57,330, some noted to be "bonus," others noted to be "travel," and others with no notation. The checks range from check #44509 on February 14, 2000 to check #44540 on September 29, 2000, a difference of 31 manual checks having been written in between that have not been produced for inspection. None of the aforementioned checks appear in the AP Check Register. Copies of the manually created checks are attached as Exhibit E.

40. On the NBPB Vendor Amounts for 1999, "Boyd Publications" is listed as receiving $200,000 (see Exhibit A). The AP Check Register for checks

written by R.H. Boyd Publishing Corporation lists check # 45168, also in the amount of $200,000, as being made payable (in hand writing) to be "R.H. Boyd Publishing." There is no GL classification code indicated for this payment. (See Exhibit B).

41. I also recall that during the mediation in May of 2003, I discovered a notation in the records produced by defendant indicating that two payments made to Dr. Boyd that were reclassified in the general ledger as manufacturing. Within the last 24 hours I made a diligent search of my office, but I have not been able to locate the document I had in my possession during the mediation.

I have read the above affidavit and swear or affirm that it is true to the best of my knowledge and belief.

_____
Edward E. DeMuzzio

Dated at New London, Connecticut on this 26th day of November, 2003.

Before the undersigned duly appeared Edward E. DeMuzzio, president of CCI. Inc., who swore to the truth of the above affidavit.

_____
Jacques J. Parenteau
Commissioner of the Superior Court