FILED

2003 DEC -4  A 10: 32

US DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CCI, INC. | ) | **CIVIL ACTION NO.** |
| | ) | **3:00CV1860 (SRU)** |
| vs. | ) | |
| | ) | |
| R.H. BOYD PUBLISHING CORPORATION | ) | |
| | ) | **DECEMBER 3, 2003** |

### DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO QUASH NOTICE OF DEPOSITION OF DR. T.B. BOYD

The Defendant, R.H. Boyd Publishing Corporation, has moved to quash that portion of a Notice of Deposition of Dr. T.B. Boyd requesting that Dr. Boyd produce his personal income tax returns for the years 1999 and 2000. The Defendant stated, in its motion, its reasons to quash this document request and the Plaintiff has filed a Memorandum In Opposition to the Plaintiff's motion. The Defendant on its own behalf and on behalf of Dr. T.B. Boyd cannot adequately express their outrage at the Plaintiff's suggestion that Defendant's motivation behind its "change in software, a change in corporate status, a change in name and a change in fiscal calendar year", and by logical extension, abandonment of the MXP software and manual recreation of its books and records at a cost of several hundred thousand dollars, was part of a "scheme to defraud the IRS".

Plaintiff's Theory Is Without Foundation

This accusation is without foundation in fact and based upon pure speculation, misinterpretation of evidence, misreading of evidence, and Plaintiff's failure to consider or present other evidence in this case. The Defendant believes that this subpoena and theory, launched at the 11th hour, before the discovery period is to close, was done to harass the Defendant and Dr. Boyd and was not presented for a proper purpose.

This Court chastised the Defendant for making a request for an extension of time to disclose an expert witness, observing that this case is three years old with a final discovery deadline of January 1, 2004, and noted that, if granted, the Plaintiff's request could very likely result in a further extension of deadlines in the case. The Court also noted that the Plaintiff has relied on the discovery produced to date, that the Plaintiff might have to hire an expert to rebut the testimony of the newly disclosed expert, and "will need to adjust its defenses of the counterclaims", and found that the Defendant "must have realized that its own claims required expert testimony".

A similar argument can be made against the Plaintiff's request for Dr. Boyd's personal tax returns. This new theory of motivation (i.e., to avoid declaration of personal income) comes after discovery has essentially been completed, after the Plaintiff has had the documents it now claims supports this new theory for over a year, will certainly result in the Defendant requesting an extension of deadlines to have an opportunity to fully review its records to rebut this

- 2 -

accusation and hire and disclose an accountant or other professional to assist in the process, and

to disclose an expert to testify in defense of this claim.  The Defendant suspects that the Plaintiff

might also request an extension of deadlines to perform further discovery.  In fact, the Plaintiff

states in its memorandum: "... but at this stage in the litigation plaintiff is entitled to discover

information that may lead to the discovery of additional evidence to support its theory ....."

There can be no other meaning to the Plaintiff's statement if allowed to examine Dr. Boyd on his

tax return, that the Plaintiff will be seeking an extension of the deadlines in this case to conduct

further discovery.

What the Defendant finds equally egregious is that this theory comes out of an off handed

remark made by Defendant's counsel in the course of the mediation process in which

Defendant's counsel asked Plaintiff's counsel what the Defendant's motivation would be to

spend several hundred thousand dollars to reconstruct its financial records as opposed to having

the Plaintiff again make corrections to the MXP software, or at least contact the Plaintiff in

connection with this reconstruction.  The result of that off handed comment appears to be this

theory and the resulting subpoena.

Plaintiff Has Failed To Fully Answer Defendant's Discovery Requests

The Defendant intends on filing a separate motion directed at the Plaintiff's failure to

fully respond to Defendant's disclosure requests but would point that out in this memorandum.

The Defendant is scheduled to complete the deposition of Mr. DeMuzzio, which commenced

- 3 -

LAW OFFICES • O'BRIEN, SHAFNER, STUART, KELLY & MORRIS, P.C.
P.O. BOX 310 • NORWICH, CONNECTICUT 06360 • 860-889-3855 • FAX: 860-886-6352 • JURIS NUMBER 412176

prior to the start of mediation. The Defendant has asked in its discovery requests for production

of documents consisting of records of the names of CCI employees, the time spent by the

employees on the conversion process and the work that was performed on each day, records

which the Plaintiff indicated were contained on the hard drive of the computer containing the

MXP software. The Plaintiff had indicated that the information could be retrieved by it from the

computer, but the Defendant has never received those records. The Defendant has also not

received the names of other corporate clients to which Plaintiff has supplied and supported MXP

software, which Plaintiff had previously objected to producing, and particularly information

relating to other pending litigation with a prior customer. This has now been put in issue by the

DeMuzzio affidavit, Paragraph 31, in which Mr. DeMuzzio asserts that "CCI supports MXP

software for many corporate clients, some larger than Boyd. MXP software operates successfully

for CCI, Inc.'s other clients and has never been claimed to be defective. Additionally, CCI has

been involved with conversions of data in the past similar to the conversion situation in Boyd.

No prior corporate client has ever experienced the problems that Boyd claims to have

experienced.[1] [emphasis added] This information is necessary for the Defendant to complete the

deposition of Mr. DeMuzzio.

---

[1] Mr. DeMuzzio has testified at a deposition that he had no prior experience involving a conversion from WDS II to MXP. Therefore information regarding prior conversion experience is particularly relevant. See Exhibit M, Pages 16 - 17

- 4 -

<u>The Plaintiff Has Admitted An Error In The Conversion Process</u>

Throughout the course of this litigation, the Plaintiff has continuously maintained the position that the conversion of the software was accurate and that any problems experienced with the operation of the software were caused by the Defendant. The Plaintiff's main contention has been that the Defendant did not permit its employees to be trained on the operation of the software. Now, for the first time, the Plaintiff admits that there was an error in the conversion process in the general ledger, the single most important component of the accounting system. Simply stated, the general ledger was out of balance. The Plaintiff's reaction to this admission is not to accept responsibility for it, nor accept responsibility for the damages it caused, but to create a new theory that the Plaintiff's error somehow was used by the Defendant as a means to hide income for Dr. Boyd and spend several hundred thousand dollars to recreate its books and records in order to do so.

<u>The Plaintiff Was Aware Of The Defendant's Claim Regarding Unreliability Of The Converted Information Throughout During This Litigation</u>

The documents produced in the course of discovery, and which the Plaintiff uses to support its new theory, have been available to the Plaintiff for over a year. In fact the Plaintiff has known of the complaints regarding the unreliability of the information generated by the MXP software since before this case was filed. This issue has arisen numerous times during the course of discovery in this case. Interestingly, nowhere in the Plaintiff's Memorandum does it state

- 5 -

when the Plaintiff obtained the documents which support this new theory. In order to believe

that the Plaintiff's theory is the result of some newly discovered evidence or issue, the Court

would have to believe that the Plaintiff has not had access to all of the records which it uses to

support its theory. The Defendant offers the following in support of its continued objection to

producing the personal tax returns of Dr. T.B. Boyd:

1. The Affidavit of Rev. Walter Grant, the Finance Director for the Defendant, in which

Rev. Grant states that the MXP software conversion was undertaken at the recommendation of

the Plaintiff and not as the Plaintiff indicates at the direction of the Defendant. It was the

Plaintiff as the hired professional computer expert which made the recommendation to convert to

the MXP software. While the Defendant approved of the conversion (just as it had converted

from IBM several years earlier), it was based upon the advice of its professional, the Plaintiff.

Notwithstanding Plaintiff's claim that Boyd had been informed in 1998 that it could remain on

the WDS II system, Rev. Grant testified at his deposition that it was his understanding that WDS

II would not be Y2K compatible. See Exhibit A, Transcript of Rev. Walter Grant at Page 13.

2. During the course of discovery in this case, the Defendant produced several thousand

pages of documents. Included within those documents was a "Defendant's Supplemental

Response to Plaintiff's First, Second and Third Set of Production Requests". Copy attached as

Exhibit B. As part of this production response, which was dated January 22, 2002, the Defendant

produced trial balance work sheets, check audit trial as of November 8, 1999, accounts payable

- 6 -

for year 2000, and checks, all run from the MXP software.[2]   The Plaintiff has had those

documents for almost 2 years.  There was certainly ample time for the Plaintiff to calculate the

amount the was paid to Dr. Boyd and to note the classification of those checks in the general

ledger; armed with that information, the Plaintiff could have noticed Dr. Boyd's deposition, thus

bringing this issue to the attention of the Defendant and the Court many months ago.   The

Defendant is aware that this case was in mediation for an extended period of time beginning in

June , 20002 till July, 2003, but Plaintiff still had an opportunity to conduct discovery for the five

months prior to referral to ADR and for a number of months since.  The Defendant submits that

the Plaintiff has had this new theory for months and has determined to raise the issue on the eve

of the termination of the discovery period for no other reason than delay and harassment.

  3.  The documents provided by the Defendant in its January, 2002 production also

provided the Plaintiff with the same general ledgers which the Defendant has continuously

claimed were inaccurate, and this was not the first time that the Plaintiff was told that the MXP

software was producing inaccurate reports, which included the general ledger.

_____

  [2] As pointed out in Rev. Grant's affidavit, some non-MXP run checks (manual checks) were also
produced, but were not covered under the scope of the Plaintiff's discovery request which only covered
checks run from the MXP System.  These checks were erroneously included within Defendant's
production.

- 7 -

A report prepared by the Defendant's accountants, Price & Associates and dated April 9, 2001 outlines the Defendant's complaints. See Exhibit C attached. This report was provided to the Plaintiff as part of Defendant's initial document production prior to January, 2002. The Plaintiff deposed Mr. Phillip Hull, the author of the report at Price & Associates on December 12, 2001. Mr. Hull testified to the problems with the MXP software and stated: "We were unable to reconcile certain accounts with the financial records that were given to us. And those were the problems – that was the problem that had been told to us why they weren't reconciling such as balances, et cetera, cash accounts." Mr. Hull also testified that he, together with Defendant's MIS Coordinator, Deborah Holt, ran two reports which produced inconsistent results (after the system was off line and no new data had been input). Mr. Hull and his staff also participated in the reconstruction of the financial records after the decision was made to abandon the MXP software. See excerpt of Hull deposition attached as Exhibit D at 31 - 35,  48 - 57 .

The Defendant, at great cost and expense, noticed the deposition of representatives of Foresight Software, the company that designed and manufactured the MXP software, on August 27, 2001.   Foresight is located in Atlanta, Georgia. Foresight produces software applications that handle "financials, distribution, manufacturing, service management, and payroll and human resources."   Foresight products are sold through representatives known as "business partners". The Plaintiff, CCI, Inc., is a Foresight business partner.   What the Defendant learned at that deposition was that the Defendant complained in November, 1999 about the performance of the

- 8 -

LAW OFFICES • O'BRIEN, SHAFNER, STUART, KELLY & MORRIS, P.C.
P.O. BOX 310 • NORWICH, CONNECTICUT 06360 • 860-889-3855 • FAX: 860-886-6352 • JURIS NUMBER 412176

MXP software and Foresight's business partner, the Plaintiff, CCI, Inc. The Defendant deposed

Corey Lynn Martin, help desk manager for Foresight,[3] in charge of dealing with and resolving

customer complaints. Her first contact with the Defendant was in October, 1999 through a

question that came to the help desk. Ms. Martin produced her file at the deposition which

consisted of documents related to the MXP software sold to the Defendant by the Plaintiff. Of

significance to the issue at hand are the following facts from Ms. Martin's deposition:

a. On November 9, 1999, Ms. Martin had a conference call in which the participants

included Ms. Martin, Rev. Grant, Deborah Holt, and Edward DeMuzzio. Among the

items contained on her notes, marked as Exhibit F attached, it reads on the second page:

"Trying to resolve historical data from the old system. Have transactions which are still

missing. They see items which were previously closed in the old system that are now

open". See Exhibit E at Pages 42 - 54.

b. On November 10, 1999, Ms. Martin had a phone call from Mr. Jesse Kinzer (who was

working with Ms. Holt on the MXP conversion). Mr. Kinzer complained to Ms. Martin

about the Plaintiff's performance and that Dr. Boyd wanted a different "business partner".

See Exhibit G; Pages 56 - 59 of Exhibit E.

---

[3] At the time of the deposition, Corey Lynn Martin was married. At the time period relevant to this case, she was known by her maiden name of Corey Lynn Crogan, which is the name which appears on the majority of the Foresight documents attached as exhibits. All facts stated herein are supported by the attached portions of the transcript of her deposition as Exhibit E.

- 9 -

LAW OFFICES • O'BRIEN, SHAFNER, STUART, KELLY & MORRIS, P.C.
P.O. BOX 310 • NORWICH, CONNECTICUT 06360 • 860-889-3855 • FAX: 860-886-6352 • JURIS NUMBER 412176

c. Ms. Martin was engaged in discussions with both the Plaintiff and Defendant in an effort to assist them in resolving the issues between them, which was something that she customarily did. In response to her suggestion that a list be generated to summarize the outstanding issues, CCI produced a list dated November 15, 1999[4]. See Exhibit H; Exhibit E, Pages 62 - 64.

d. On November 17, 1999, Ms. Martin had a conversation with Mr. DeMuzzio and others connected with Foresight, but excluding the Defendant. Her notes indicate that Mr. DeMuzzio did not have a conversation with Dr. Boyd (which Ms. Martin had suggested in an earlier conversation she had with Dr. Boyd concerning termination of CCI). One other item was the "dumping" of the general ledger. See Exhibit I; Exhibit E, Pages 67 - 72.

e. On November 18, 1999, Ms. Martin had a conference call with both the Plaintiff and Defendant. Her memo indicates that there were a total of 96 items on the Hot List, that 17 of them were "mods" (i.e., modifications of software) and that 37 of those items had been addressed. It also indicates that the Defendant claimed that the items marked "done" on the list were not done. See Exhibit J; Exhibit E, Pages 77 - 79.

---

[4] This list became known by the parties as the "Hot List" and was used by the parties to identify outstanding issues.

- 10 -

LAW OFFICES • O'BRIEN, SHAFNER, STUART, KELLY & MORRIS, P.C.

P.O. BOX 310 • NORWICH, CONNECTICUT 06360 • 860-889-3855 • FAX: 860-886-6352 • JURIS NUMBER 412176

f. As of April 5, 2000, there had been discussions between the Plaintiff and Defendant about moving the MXP software to an NT platform from the Unix operating system. Ms. Crogan's memo and her testimony are to the effect that in this conversation, the Plaintiff was told that Dr. Boyd, Ms. Holt and Rev. Grant were still not satisfied with the software and that the Defendant was "trying to get reports done and when one problem is corrected another is created". In addition, Ms. Martin's written notes state: "Believe that this software may not be a fit for them.". See Exhibit K, Exhibit E, Page 107 - 108.

4. The Plaintiff also took the deposition of Rev. Walter Grant on December 12, 2001. Reverend Grant testified to the following:

a. He assigned the task of the WDS II conversion to Jesse Kinzer and Deborah Holt. Exhibit L, at Pages 14 - 15.

b. Manual checks were produced because of the inability to process checks accurately using the MXP software. "The accounts payable clerk complained all of the time of the difficulty she was having getting checks processed....Also, we had to revert back to a manual process of inputting as far as prior to inputting we had to use a stamper to assign a number to the invoice and then record that number and the invoice and all of the other information on the invoices rather than the machine generating." Exhibit L, at Pages 35 - 37.

- 11 -

LAW OFFICES • O'BRIEN, SHAFNER, STUART, KELLY & MORRIS, P.C.
P.O. BOX 310 • NORWICH, CONNECTICUT 06360 • 860-889-3855 • FAX: 860-886-6352 • JURIS NUMBER 412176

c. When asked about reviewing the trial balance for year 2000, Rev. Grant responded: "No. I was still - - in 2000 I was still reviewing the financials of December. That's the only one we were able to generate [referring to the MXP software]. For the year 2000, we basically did not use any of the general ledger software or any parts of it because the information was never brought over correctly [from WDS II], therefore, we cannot rely on the beginning balances, therefore, we cannot rely on any balances. We, therefore, prepared the year 2000 manually." See Exhibit L, Page 84 - 85.

d. In connection with the "dumping" of data, Rev. Grant defined dumping as transfer of all of the data from WDS II to MXP. It was Rev. Grant's position that all of the data from the WDS II software was either not converted over at all to the MXP software, or not converted accurately. See Exhibit L, Pages 97 - 99, and Rev. Grant Affidavit.

From the Affidavit and testimony of Rev. Grant, the testimony of Phil Hull, and the testimony of Corey Lynn Martin, it is clear that Boyd was on record early in the conversion process regarding the deficiencies in the MXP software and its inability to produce reliable reports. It is also clear this was made apparent to the Plaintiff in various forms (discovery responses, deposition exhibits, deposition testimony), and included Boyd's complaints about the inability to produce an accurate trial balance/general ledger as far back as at least December of 2001 and January of 2002. When the Plaintiff says at Page 4 of its Memorandum: "While there is evidence that R.H. Boyd converted at least some of the data from MXP, this aspect of the case

- 12 -

has not been closely examined." For the Plaintiff to say three years into this litigation that it has

not "closely examined" the extent of the data converted from MXP is to admit that it has failed to

timely review the data and documents provided to it.

The Plaintiff would have the Court believe that this case has proceeded in a vacuum and

that the information that supports its latest theory is newly discovered evidence. The Defendant

has been consistent in its assertions that this software just did not perform as Plaintiff represented

that it would. The Plaintiff has continuously maintained that there were no flaws to the software

and that the Defendant's problems with the MXP software were caused solely by the Defendant.

Now that the Plaintiff admits that the general ledger did not balance, it makes this last minute

desperate attempt to find a new way to blame the Defendant. The Court should not support this

unwarranted intrusion into Dr. Boyd's personal tax records and quash that portion of the

deposition notice requiring production of the tax returns. The Court should also order the

Plaintiff to immediately comply with the balance of the Defendant's discovery requests.

THE DEFENDANT

By_____
     Mark E. Block for O'Brien, Shafner,
     Stuart, Kelly & Morris, P.C.
     ct 06557

- 13 -

LAW OFFICES • O'BRIEN, SHAFNER, STUART, KELLY & MORRIS, P.C.

P.O. BOX 310 • NORWICH, CONNECTICUT 06360 • 860-889-3855 • FAX: 860-886-6352 • JURIS NUMBER 412176

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing has been faxed and mailed, postage prepaid on this _____ day of December 2003 to the following:

Jacques J. Parenteau, Esquire
Madsen, Prestley & Parenteau, LLC
111 Huntington Street
P. O. Box 1631
New London, CT  06320

_____
Mark E. Block for O'Brien, Shafner,
Stuart, Kelly & Morris, P.C.
ct 06557

- 14 -

F:\USERS\MEB\rh boyd\reply memorandum re motion to quash.wpd

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CCI, INC. | CIVIL ACTION NO.<br>3:00CV1860 (SRU) |
| vs. | |
| R.H. BOYD PUBLISHING CORPORATION | DECEMBER 3, 2003 |

### AFFIDAVIT OF REV. WALTER GRANT

The undersigned, Walter Grant, being duly sworn, did depose and say:

    1.     I believe in the obligations of an oath and am over the age of eighteen.

    2.     I am the Director of Finance of the R.H. Boyd Publishing Corporation ("Boyd")
and make this affidavit of my own personal knowledge.

    3.     I make this affidavit in order to address the statements made in the affidavit of
Edward E. DeMuzzio in support of the Plaintiff's "Memorandum in Opposition to Defendant
R.H. Boyd Publishing Company's Motion to Quash Notice of Deposition and For Protective
Order".

    4.     CCI, Inc. ("CCI") had been employed by Boyd for approximately two (2) years
prior to entering into the contract for conversion of Boyd's WDSII software to MXP Software.

The WDSII software had been running successfully at Boyd since 1994 and Boyd had developed all of its forms and systems to run off of WDSII.

     5.     Prior to installation of the WDSII software, Boyd had operated IBM System 36 software, and had experience in data conversion from the IBM software to WDSII software. The conversion from the IBM software to the WDSII software enabled Boyd to change the means of data entry from a centralized data entry department to data entry by individual departments and individual users.

     6.     CCI was employed by Boyd in order to support the WDSII software, through custom modifications, technical application support and operating system support. In other words, CCI made certain modifications to the WDSII system at the request of Boyd, answered technical questions of the users, and problem-solved if there were functional problems with the system or user complaints.

     7.     In anticipation of the year 2000 issues relating to hardware and software reliability, Boyd decided to convert from its Unix based system to an NT (Windows) platform and had new hardware installed in 1998. The decision to convert from WDSII to MXP was made on the advice of and after consultation with Edward DeMuzzio, the CCI representative with whom Boyd had contact and upon whose experience the company had relied during the preceding two years.

- 2 -

8.     Mr. DeMuzzio was fully aware of the needs of Boyd relative to the functions that the software would have to perform and that the data contained on the WDSII software would have to be converted to the MXP software. At no time to my knowledge did Mr. DeMuzzio inform anyone at Boyd that WDSII could not successfully be converted to MXP.

9.     While the corporate name change and year end conversion were extra tasks to be performed by CCI and not contained in the original contract, at no time did Mr. DeMuzzio inform me, as the Director of Finance, that these changes could not be made, or that they would have any adverse impact on the conversion process, or that the changes could not be implemented in time for the Y2K conversion.

10.     Contrary to the statement made in Paragraph 12 of Mr. DeMuzzio's Affidavit that Boyd was "required to support the conversion project by comparing the converted forms and data to assure accuracy", the Sales Agreement required Boyd to "assist CCI with functional testing to ensure accuracy of system." The Sales Agreement provided CCI would provide Boyd "with a check-off sheet that must be signed by the designated person in accordance with a predetermined schedule before the cut-over to the new system can be accomplished". Finally, the Sales Agreement provided that "[d]ata conversion includes dumping data from the old National Baptist WDSII System and loading these into MXP. Printouts from the new MXP files will be provided to National Baptist confirming the integrity of the new data."

- 3 -

11.     CCI failed to provide Boyd a check-off sheet for Boyd to have its personnel sign

off before cut-over to the MXP software.  However, Boyd did assist CCI with the functional

testing and did review printouts from the system.  In all cases, Boyd advised CCI that the data as

converted by the MXP software was not accurate.  On several occasions we required CCI to

"dump" the data again, which means that we requested CCI to again transfer data from WDSII to

MXP because the data transferred to MXP was not accurately converted.  This specifically

related to the general ledger component or module of the system, which did not balance at any

time during and after the conversion process.  For example, see "Hot List" submitted as

supporting Exhibit H to the accompanying memorandum.

12.     I was not responsible for the implementation of the conversion process for Boyd.

As Finance Director, I answered to the president of the company, responsibility for

implementation of the conversion being delegated to Mr. Jessie Kinzer and Ms. Deborah Holt,

Boyd's MIS coordinator.

13.     CCI knew of the general ledger and the numerous other conversion issues

beginning at least as early as November, 1999.  Ms. Deborah Holt, Boyd's MIS coordinator, sent

Mr. DeMuzzio a letter dated November 15, 1999 specifying Boyd's complaints.  These

complaints about CCI's performance were also made to Foresight Software.  The "Hot Lists"

generated by CCI documented performance issues raised by Boyd.  The November 15, 1999

- 4 -

letter, Hot List, and memos regarding discussions with Foresight Software are made Exhibits N, H, I, J and K to the Memorandum of Law to which this Affidavit is attached.

14. CCI also knew early in this litigation that the balancing of the general ledger was an issue. As part of Boyd's discovery, we produced a copy of a report by Price & Associates, Boyd's Accountants which states at Page 6, paragraph 5: "NBPB was unable to determine that reports run from MXP were consistent during the dumping of data from the WDSII files". This report is attached as Exhibit C to the Memorandum of Law to which this Affidavit is attached. We also provided CCI with reports run off MXP by supplemental disclosure dated January 22, 2002. See copy attached as Exhibit B to Memorandum of Law to which this Affidavit is attached.

15. Mr. DeMuzzio was aware into 2000 that the general ledger remained out of balance, that there were still unresolved issues with CCI, and that CCI had not resolved all of Boyd's complaints. Notwithstanding the memos CCI has submitted regarding payment of CCI's outstanding balance, Boyd determined that it would not pay CCI because all of the performance issues regarding the MXP software were not resolved, and Boyd finally determined that it could not make use of the MXP software.

16. As part of Boyd's Supplemental Response to CCI's production requests, we provided an accounts payable check report run off MXP together with the checks that were run

- 5 -

off of MXP, and manual checks which were prepared manually because of difficulties experienced with the MXP's performance. While the checks run off MXP appear on the MXP-generated register, the manual checks do not appear on that register. While some manual checks were produced, CCI only requested checks produced by the MXP software. The manual checks were, therefore, produced in error.

17.    Mr. DeMuzzio, in his affidavit, makes much of the general ledger coding for checks written to Dr. Boyd. The failure of performance of the MXP software required reconstruction of Boyd's records in MAS 90 software, whereby each transaction was entered and accounts reconciled month by month for the year 2000. The disbursements questioned by CCI in its memorandum, which were originally recorded in MXP, were coded as "Miscellaneous" and "Housing" by CCI, which showed them as zero on the ledger for the year ending 2000, as shown in Exhibit C to the CCI memorandam. As part of the reconstruction of Boyd's records in the MAS 90 software, the reclassification of the disbursements to Dr. Boyd were to the proper accounts, i.e., Salaries and Wages #6000-05-53 and Notes Receivable Officers #1421. In addition, Dr. Boyd has a loan account with the company, which clearly shows on the general ledger trial balance which Mr. DeMuzzio claims inaccurately reflects the checks paid to Dr. Boyd. On the Trial Balance, labeled as "Exhibit D" to CCI's memorandum, page a, Account

- 6 -

1421-00-00 reads "note receivable officers," which is where Dr. Boyd's loans from the company are posted.

18.    Contrary to the assertions of Mr. DeMuzzio and CCI, the manual reconstruction of Boyd's records had nothing to do with the alleged failure of the company to accurately report Dr. Boyd's income. The corporate name changes, and changes in fiscal year and corporate form were all approved by Boyd's Board of Directors and were made solely for proper business purposes.

19.    Contrary to the assertions of Mr. DeMuzzio and CCI, the manual reconstruction of Boyd's records had everything to do with and was required by the failure of performance of the MXP Software. The company's problems with the performance of the MXP software began after the initial conversion in October, 1999, were reported to CCI through myself and Deborah Holt, were brought to the attention of the software manufacturer, Foresight, and finally resulted in our abandoning the MXP software. The company performed a manual reconstruction of records because it was felt that there was no other alternative. This process involved our accountants, Price & Associates.

Walter Grant

- 7 -

Subscribed and sworn to before me on this 3rd day of December 2003.

_____
Notary Public
My Commission Expires: 9/25/2004

F:\USERS\MEB\rh boyd\rev grant affidavit.wpd

- 8 -